IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| EMILY SIZEMORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:23cv198-MHT |
| | ) | (WO) |
| CITY OF MONTGOMERY, | ) | |
| ALABAMA, a municipal | ) | |
| corporation; et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER ON SUMMARY JUDGMENT

Following a traffic stop, plaintiff Emily Sizemore was arrested and tased several times by a City of Montgomery police officer. Relying on 42 U.S.C. § 1983, she brings two federal claims in this lawsuit: one against defendant Richard A. Dorman, the arresting police officer, for excessive force in violation of her Fourth Amendment rights; and the other against defendants City of Montgomery and former City Police Chief Ernest Finely, claiming, under several theories, that they are responsible for Officer Dorman's actions. Sizemore also

brings related state claims against Dorman for assault and battery, invasion of privacy, outrage, and negligence. The court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 1367 (supplemental).

This case is before the court on motions for summary judgment filed by Dorman, Finley, and the City of Montgomery.[1] For the reasons discussed below, summary judgment is denied as to only the following claims against Dorman: excessive force, assault and battery, and negligence. These federal and state claims against Dorman will proceed to trial. Summary judgment will be entered in favor of all defendants on all other claims.

## I.  SUMMARY-JUDGMENT STANDARD

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact

---

1. Both sides also moved to exclude each other's expert witnesses. Those motions are addressed in a separate order. The court did not rely on any expert materials when reaching its summary-judgment decision.

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in favor of that party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If video evidence "obviously contradicts the nonmovant's version of the facts, [courts] accept the video's depiction." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (quoting *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (per curiam)). But when a video is ambiguous, then the court reverts to "the usual rule" of viewing the record in the light most favorable to the non-movant. *See Brooks v. Miller*, 78 F.4th 1267, 1271-72 (11th Cir. 2023).

3

## II.  FACTUAL BACKGROUND

The facts, taken in the light most favorable to Sizemore and as presented by the body-worn and vehicle-mounted cameras, are as follows.

### A. The Stop

Near midnight on April 9, 2021, Sizemore was driving home when a Montgomery Police vehicle pulled up behind her and signaled for her to pull over.  She drove the remaining 20–30 seconds to her house and pulled into the bottom third of the driveway.  Officer Dorman pulled in behind her, exited his vehicle, and approached her car.  Sizemore opened the door.  When Dorman approached, she asked him, "excuse me, who are you?," "why did you follow me?," and "what, if anything, have I done wrong?"  Pl.'s Decl. (Doc. 100-1) ¶ 8.[2]  Dorman did not identify himself.

_____

2. This part of the exchange is visually captured on Dorman's vehicle-mounted camera.  However, no audio is available because Dorman had not yet activated his body-worn camera.  The court therefore takes as true Sizemore's recollection of this exchange.

4

He shone his flashlight into her car and "immediately began to demand" that she get out of the vehicle.  *Id.* ¶ 9.  Sizemore again asked Dorman why he pulled her over and "why he was on [her] property?"  *Id.* ¶ 12.  Dorman repeated his order for Sizemore to exit the vehicle and stepped closer.  At this point, Sizemore drove farther up the driveway, closing the door as she went.

Dorman followed on foot and again approached the driver's-side door.[3]  Sizemore was typing on her phone, apparently trying to contact someone.  She says she was trying to call her mother, who worked with the Montgomery Police Department as a Bishop in the Good Shepherd Program; she hoped her mother "could help calm the situation down and get some sort of understanding from

---

3. This is where the body-worn camera footage begins. However, there is no audio for the first 30 seconds because of how body-worn cameras operate.  When an officer turns on his body-worn camera, the camera automatically stores 30 seconds of visual information preceding activation of the camera, but no audio from that time period.  *See* Dorman Dep. (Doc. 69-1) at 55:11-16.

this officer as to why he pulled [her] over and demanded [she] get out of [the] vehicle." *Id.* She says Dorman threatened to break the window of her car unless she either rolled the window down or opened the door. Sizemore then got visibly upset, opened her door, and yelled to Dorman, "excuse me sir, you don't know who the f*** I am!" and "get off my property!"[4] Body-Worn Camera Footage (Doc. 69-2) at 0:30–34. She stayed in her car. In response, Dorman moved to grab Sizemore's wrist.

### B. The First Tase

When Dorman moved to grab Sizemore's wrist, a small struggle ensued. The footage from the vehicle-mounted camera and the body-worn camera do not provide a clear view of what happened. The vehicle-mounted footage is blurry, but Dorman's figure can be seen trying to pull Sizemore from the car, and when that does not work, climbing into the car. *See* Vehicle-Mounted Footage

---

4. Because the audio starts here, this is when Dorman activated his body-worn camera.

(Doc. 69-4) at 41:57-42:11. The body-worn camera footage is hard to decipher because Sizemore and Dorman are in close quarters. Not much is clearly visible, but Sizemore can be heard saying, "get off me!" and "don't f***ing touch me!" and there is the sound of a handcuff tightening. Body-Worn Camera Footage (Doc. 69-2) at 0:40-49.[5]

Dorman then tried again to pull Sizemore from the vehicle, this time using the handcuff attached to her wrist. Sizemore resisted. She told Dorman, "don't f***ing touch me, dude," "what the f*** is wrong with you?!," and "I'll whoop your ass, dude." *Id.* at 0:51-0:59. Dorman got back in the car and told Sizemore, "you have two seconds to get out the car." *Id.* at 1:04.

_____

5. During this struggle, Dorman claims that Sizemore kicked him. Sizemore says her feet flailed as she "attempted to backpedal away" from Dorman. Pl.'s Decl. ¶ 22. Neither the body-worn camera nor the vehicle-mounted camera provides a clear view of what happened. There are flashes of what look like sparkles from Sizemore's shoes, but it is not clear if she was attempting to kick Dorman or backpedaling away.

7

Sizemore, who at that point was in the passenger seat, facing the windshield and holding her phone, replied, "sir are you f***in' serious? I gotta call my mom" at the same time Dorman counted out "one." *Id.* at 1:06. Dorman waited four more seconds, then tased Sizemore. A buzzing sound can be heard on the body-worn camera audio, followed by Sizemore screaming. *See id.* at 1:11.

### C. The Second and Third Tases

Immediately after tasing Sizemore, Dorman yelled, "get out the car!" and pulled on the handcuff again. *Id.* at 1:12. About 16 seconds passed before Dorman tased Sizemore a second time. During those 16 seconds, Sizemore recalls that she was "attempt[ing] to get out of the vehicle," but it was "difficult" because her "left arm was being controlled by the officer," she "had just been tased," and she "was also overweight at the time." Pl.'s Decl. (Doc. 100-1) ¶ 16. She got to the driver's-side doorway, at which point her "butt was on the side ledge of the car door and both of [her] feet

were on the driveway." *Id.* ¶ 17. She attempted to stand up, but before she could, Dorman tased her the second time.

The video is consistent with Sizemore's recollection. It shows that Sizemore stopped trying to call her mom; that with her handcuffed left arm out in front of her, she moved from the passenger seat to the driver's side seat, and to the vehicle exit; and that she rotated herself so that she was perpendicular to the windshield, placed both feet on the ground outside the driver's side door, and leaned her upper body forward as if to stand up. While she was moving, she said, "oh my f***ing god I didn't do sh**" and "you're going to break my f***ing hand oh my god." Body-Worn Camera Footage (Doc. 69-2) at 1:14-20.

Viewing the footage in the light most favorable to Sizemore, it looks as though during these 16 seconds, Sizemore had stopped resisting, was attempting to exit the vehicle, and was about to stand up. But before she

9

could do so, Dorman activated his taser. *See id.* at 1:27. Sizemore fell to the ground, screaming. Sizemore also asserts that at some point after the second taser activation, when she was on the ground, Dorman tased her a third time. *See* Pl.'s Decl. ¶ 17 ("As he was tasing me, he pushed me against the side of my house and then the officer shoved me to the ground as he continued to tase me.").[6]

---

6. Dorman says he tased Sizemore twice. He argues in his brief that his position is clearly supported by the video, but at oral argument on the summary-judgment motions his counsel acknowledged there is a factual dispute between Dorman's and Sizemore's testimony.

In any event, the court finds the video ambiguous. Throughout the time between when Dorman activated the taser for the second time and when he finished securing Sizemore's wrists in handcuffs, crackling sounds can be heard on the body-worn camera audio. *See* Body-Worn Camera Footage (Doc. 69-2) at 1:27–28 and 1:30–32. It is unclear if the noise is due to Sizemore's screaming, whether it is the sound of Dorman tasing Sizemore as she falls to the ground, or both. The taser log is not available to confirm Dorman's account. *See* Killough Dep. (Doc. 99-4) at 106:4–8. Meanwhile, Sizemore submitted a photograph of her abdomen, which appears to show three sets of burn wounds. *See* Photographs (Doc 100-10) at 3. Dorman's counsel acknowledged that for summary judgment,

10

### D. The Aftermath

Dorman finished handcuffing Sizemore, took a few more seconds, then stood up and radioed for assistance. Other officers approached and led Sizemore away.

The Montgomery Police Department took Sizemore to the county jail, where she was booked and strip-searched. During the strip-search, she was told to bend over and remove her tampon while on her menstrual period. In total, Sizemore spent several hours in jail. Upon leaving, she was charged with improper headlights, failure to display insurance, an expired tag, and harassment. All the charges were later dismissed.

Sizemore suffered burns from the taser applications, a bruised wrist, and additional bruising to her arms and torso. For two years, she was largely unable to drive

---

the court should not discount the photograph. Because the video does not clearly contradict Sizemore's version of events, the court leaves resolution of this issue to the jury. It assumes, for summary-judgment purposes though, that Dorman tased Sizemore three times.

for fear of being pulled over and subjected to similar treatment. Sizemore reports that she continues to experience severe anxiety as a result of her encounter with Dorman.

### III.   DISCUSSION

#### A. Claims Against Dorman

Sizemore brings a federal claim, based on § 1983, against Dorman for excessive force. She also brings four state claims against him. Dorman responds that qualified immunity shields him from liability on the federal claim, and that state-agent immunity shields him from liability on the state claims.

##### 1. Federal Claim

Sizemore asserts that Dorman violated her Fourth Amendment right to be free from unreasonable seizures

when he used excessive force while arresting her.[7]  Dorman asserts qualified immunity.

Qualified immunity is an affirmative defense intended to shield government officials from liability for civil damages unless "their conduct [violates] clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"An officer asserting a qualified-immunity defense bears the initial burden of showing that he was acting

---

7. In her amended complaint, Sizemore also pled that Dorman had violated her Fourteenth Amendment right to due process.  However, she has abandoned this additional federal claim because her briefing makes no reference to Fourteenth Amendment standards or caselaw.  That abandonment was wise, because Sizemore's case sounds solely in the Fourth Amendment.  *See Carr v. Tatangelo,* 338 F.3d 1259, 1267 & n. 15 (11th Cir. 2003) (holding that a plaintiff who was shot by police officer could maintain only a Fourth Amendment claim, while a plaintiff who was not physically injured during the shooting could maintain only a Fourteenth Amendment substantive-due-process claim).

within his discretionary authority." *Patel v. Lanier Cnty.*, 969 F.3d 1173, 1181 (11th Cir. 2020) (internal quotation marks omitted) (quoting *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019)). There is no dispute that Dorman was acting within the scope of his discretionary authority during the arrest. Therefore, the burden shifts to Sizemore to show that "(1) the defendant[] violated [her] federal constitutional or statutory rights" and "(2) those rights were clearly established at the time [the defendant] acted." *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008).

### a. Constitutional Violation

Where, as here, "a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam). While the right to arrest "necessarily carries with it the right to use some degree of physical coercion," the amount of force used "must be reasonably

14

proportionate to the need for that force." *Lee v. Ferraro*, 284 F.3d 1188, 1197–98 (11th Cir. 2002) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. When determining whether a use of force was impermissibly excessive, relevant factors include: "(1) the severity of the crime; (2) whether the individual 'poses an immediate threat to the safety of the officers or others'; (3) whether the individual actively resists or tries to evade arrest by flight; (4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; and (6) the severity of the injury." *Hinson v. Bias*, 927 F.3d 1103, 1117 (11th Cir. 2019) (internal citations omitted) (quoting *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009) (per curiam)).

15

"[T]he most important factor in determining whether the force used was justified ... is[] whether [the arrestee] was actively resisting or attempting to evade arrest." *Glasscox v. City of Argo*, 903 F.3d 1207, 1214 (11th Cir. 2018). And initial resistance does not automatically justify continued use of force. "[E]ven if the arrestee's resistance justified deployment of a taser initially, if he has stopped resisting ... further taser deployments are excessive." *Id.* (quoting *Wate v. Kubler*, 839 F.3d 1012, 1020 (11th Cir. 2016)).

Dorman's first taser use was legally permissible. Sizemore was resisting by refusing to follow Dorman's commands, verbally threatening him, and physically resisting his attempts to pull her from the car.[8] Thus, the most important factor weighs in Dorman's favor. Three other factors--whether the individual poses a

---

8. Dorman also contends that Sizemore kicked him, which she disputes. However, regardless of whether this kick occurred, enough other factors weigh in Dorman's favor to justify his use of force.

threat, whether the officer needs to apply force, and the amount of force applied--also weigh in Dorman's favor. Sizemore potentially posed a threat because she was verbally belligerent, had threatened to "whoop his ass," and was attempting to contact an unknown third person who could jeopardize Dorman's safety. Dorman needed to apply force to gain compliance, and he graduated to using his taser because pulling on Sizemore's arm had not worked. The fact that the first and sixth factors--the nature of the crime and the extent of any injury--lean slightly in Sizemore's favor is not diapositive. Even if a person's only suspected wrongdoing is a minor traffic violation, use of a taser is reasonable when the arrestee is "hostile, belligerent, and uncooperative." *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004). In short, it is well-established that "the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward

17

police is not excessive force." *Smith v. LePage*, 834 F.3d 1285, 1294 (11th Cir. 2016).

The second taser activation presents a different story, though. "The critical time period for purposes of determining whether the repeated use of a taser on an arrestee constituted unconstitutional excessive force spans just before the first activation through the time of the final taser deployment." *Glasscox*, 903 F.3d at 1214 (quoting *Wate*, 839 F.3d at 1020) (internal quotations and alterations omitted). Crucially, "even if the arrestee's resistance justified deployment of a taser initially, if [s]he has stopped resisting ... further taser deployments are excessive." *Id.*

The parties dispute whether Sizemore stopped resisting. Indeed, this is their primary point of contention. However, the court at summary judgment "is tasked not with weighing the evidence, making credibility choices or determining the truth of the matter, but with deciding whether there is a genuine issue for trial,

viewing the evidence and making reasonable inferences in the light most favorable to Plaintiff." *Wate*, 839 F.3d at 1021. A reasonable juror could conclude from the video footage, along with the testimony viewed in favor of Sizemore, that between the first and second taser activation Sizemore had stopped resisting and a reasonable officer would have seen that she stopped resisting. Sizemore ceased any attempt to call her mom and moved to the driver's side exit. She followed Dorman's physical guidance as he pulled on the handcuff secured around her left wrist. She placed both feet on the ground and leaned her upper body forward, as one would do to stand up. Her tone and words switched from being accusatory and even threatening toward Dorman to complaining about the pain in her hand. These were all changes that a jury could conclude a reasonable officer would have perceived.[9] Ultimately, it is the jury's

---

9. Moreover, just 16 seconds passed between the first and second taser deployments. A jury could also find

responsibility to weigh this evidence, but at summary judgment, the court views matters in the light most favorable to Sizemore. In that light, a reasonable officer would have seen that Sizemore had stopped resisting and that additional tasing was excessive.

Other factors weighed in Sizemore's favor too. The severity of the crime remained minimal, and now Sizemore posed less of a threat because she had stopped threatening Dorman and had stopped trying to contact the unknown person. The need to use more force decreased because Sizemore was following Dorman's commands and physical guidance.

Put simply, because Sizemore had stopped resisting and was visibly attempting to comply, Dorman's additional taser use was excessive. Use of any force, not just a

---

that Dorman did not give enough time for Sizemore to comply with his demands, which is what a reasonable officer would do. *See United States v. Brown*, 934 F.3d 1278, 1295 (11th Cir. 2019) (holding that failure to give a suspect sufficient time to comply with an order before using a taser constitutes excessive force).

taser, against an unresisting suspect is not reasonable. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008). Such force is excessive even if the person initially resisted but has since become compliant. *See Glasscox*, 903 F.3d at 1214.

Moreover, even if the second taser activation was reasonable, the third one was not. At that point, Sizemore was out of the vehicle per Dorman's commands, and either falling to, or already on, the ground. Continuous or rapid-fire deployment of a taser that physically prevents a person from complying with commands is unreasonable. *See Glasscox*, 903 F.3d at 1215; *see also United States v. Brown*, 934 F.3d 1278, 1295 (11th Cir. 2019).

The court will turn now to whether the right to be free from such force was clearly established at the time of Sizemore's arrest.

21

b. Clearly Established Law

There are three ways for a plaintiff in the Eleventh Circuit to show that a right was clearly established. First, "the plaintiff can point to a materially similar case decided at the time of the relevant conduct by the Supreme Court, the Eleventh Circuit, or the relevant state supreme court." *J.W. ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259 (11th Cir. 2018) (per curiam). The case "need not be directly on point," but it must "have placed the statutory or constitutional question beyond debate." *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)). "Second, the plaintiff can identify a broader, clearly established principle that should govern the novel facts of the situation." *Id.* Or, third, the plaintiff can demonstrate that the alleged conduct "so obviously violated the Constitution that prior case law is unnecessary." *Id.* at 1260.

22

*Glasscox v. City of Argo*, 903 F.3d 1207 (2018), satisfies the first prong of this test.  In *Glasscox*, a city police officer effectuated a traffic stop on a truck that was driving erratically.  After pulling the truck to the side of the highway, the officer ordered the driver out of the vehicle.  They had a quick exchange, during which the officer issued three commands to get out of the vehicle and the driver apologized and said something to effect of "I'm going to get out if you'd shut up."  *Id.* at 1211.  The officer yelled over the driver's words "don't you reach!" and immediately deployed his taser. *Id.*  Following the shock, the driver, with both hands visible, attempted to pull the taser from his skin.  The officer fired his taser again, approximately four seconds after the first shock, still ordering the driver out of the vehicle.  He deployed his taser an additional two times amidst more orders to exit the vehicle, for a total of four activations.

23

The Eleventh Circuit denied qualified immunity. It found that, even though lack of compliance and potential threats to the officer's safety "may very well have justified an initial taser shock," it did not justify continued taser shocks once the driver "ceased any resistance." *Id.* at 1216.

*Glasscox* closely mirrors this case. Both there and here, the officer was attempting to remove a suspect from their vehicle following a traffic stop. When the person failed to comply, the officer deployed his taser to gain control of the situation. In *Glasscox*, the officer fired his taser four times. Dorman activated his two to three times. And in both cases, the officer used his taser even after the suspect stopped resisting. Because "the evidence shows that [the arrestee] offered no resistance at least after the [initial] tasing ... further use of

24

the taser [was] excessive under the circumstances." *Id.* at 1214–15.[10]

To the extent that *Glasscox* differs because the taser activations were in closer succession or the plaintiff was less combative, the decision in *Wate v. Kubler*, 839 F.3d 1012 (11th Cir. 2016), demonstrates that these are not material differences. In *Wate* the officer engaged in a physical fight with the arrestee that lasted several minutes where the officer threw multiple punches and had to enlist bystander help to apply handcuffs. The struggle culminated in the officer deploying his taser five times over a two-minute span, waiting nine, 28, 18,

---

10. Dorman argues that *Draper v. Reynolds*, 369 F.3d 1270 (2004), controls. However, the critical difference between *Draper* and this case is that the officer in *Draper* deployed his taser only once. The Eleventh Circuit held that such a "*single use* of the taser gun causing a *one-time* shocking" was reasonable in light of the arrestee's refusal to cooperate. *Id.* at 1278 (emphasis added). *Draper* is material to Dorman's first taser activation. But *Draper* offers no guidance on whether multiple taser uses--especially activations after a suspect has stopped resisting--are reasonable, because the officer there used his taser only once.

and finally 30 seconds between activations.[11]  *See Wate*, 839 F.3d at 1017.  Nevertheless, the Eleventh Circuit denied qualified immunity.  What made the officer's repeated tasing unreasonable was not the amount of time between stuns, or how combative or non-combative the suspect had been earlier in the encounter, but rather the fact "that [the arrestee] had stopped resisting and had become still during this time period."  *Id.* at 1020.

Even if *Glasscox* itself is not sufficiently materially similar, "it was clearly established on the date of Mr. Glasscox's arrest that the repeated tasing of a suspect who had ceased any resistance was unlawful." *Glasscox*, 903 F.3d at 1218.  Thus, Dorman still violated the broader, clearly established principle that continued tasing of a person who is no longer resisting is unreasonable.

---

11. Dorman waited approximately 16 seconds between the first and second activation of his taser, and no less than three seconds before the third.

Even before *Glasscox*, the Eleventh Circuit had clearly established "that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley*, 526 F.3d at 1330. "Crucially, this is true even if someone resists arrest at first; the Fourth Amendment still forbids an officer from [using force against] an initially non-compliant suspect after the individual is handcuffed and no longer resisting." *Wilkerson v. Hicks*, 750 F. Supp. 3d 1313, 1326–27 (M.D. Ala. 2024) (Thompson, J.) (citing *Hadley*, 526 F.3d at 1330, *Skrtich v. Thornton*, 280 F.3d 1295 (11th Cir. 2002), and *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997) (per curiam)). Being handcuffed is not a prerequisite for gratuitous force being excessive. *See Glasscox*, 903 F.3d 1207; *see also Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009) (continued use of taser on uncuffed suspect who was initially noncompliant but stunned into compliance was still unreasonable); *cf. Priester v. City of Riviera Beach*, 208 F.3d 919 (2000)

27

(continued use of police dog on uncuffed suspect who initially attempted to kick the dog, but then complied with orders to lie motionless was still unreasonable); *Wate*, 839 F.3d at 1016-17 (continued use of taser on suspect who was handcuffed and initially noncompliant became unreasonable when suspect stopped resisting). The key difference between a justified taser deployment and a taser deployment that constitutes excessive force is whether the suspect has stopped resisting. *See Glasscox*, 903 F.3d at 1210; *Wate*, 839 F.3d at 1021.

Thus, at the time of Sizemore's arrest in 2021, it was clearly established that "noncompliance or continued physical resistance to arrest justifies the use of force by a law enforcement officer," but "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Wate*, 839 F.3d at 1021 (internal citations and quotations omitted). At an even lower level of generality, these cases demonstrate that an officer cannot continue using a taser on a suspect who

has stopped resisting, even if that suspect initially did not comply and is not yet fully secured in handcuffs. The evidence, viewed in Sizemore's favor, shows that a reasonable officer could perceive that she stopped resisting and was visibly attempting to comply with Dorman's commands. Qualified immunity is therefore denied.

Summary judgment will be denied on Sizemore's excessive-force claim against Dorman to the extent of the second and third tases. The claim to this extent will proceed to trial.

### 2. State Claims

In addition to her federal claim against Dorman, Sizemore brings state claims of assault and battery, invasion of privacy, outrage, and negligence. Dorman responds that Sizemore failed to create material issues of fact related to these claims and that, even if she did, each is barred by state-agent immunity under 1975

Ala. Code § 6-5-338[12] and *Ex Parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000). The Alabama Supreme Court has held that the immunity provided to peace officers under the statutory and common-law schemes are coextensive. *See Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2004).

State-agent immunity shields a law-enforcement officer from suit "arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." 1975 Ala. Code § 6-5-338. However, "a State agent shall not be immune from civil liability in his or her personal capacity" when either "the Constitution ... require[s] otherwise" or "when the State agent acts willfully,

---

12. The court is aware that § 6-5-338 was repealed and replaced by a new immunity statute in October 2025. However, the new statute is not retroactive and thus is not applicable to this case. *See* 1975 Ala. Code § 6-5-338.4(a) ("The protections afforded a law enforcement officer under Sections 6-5-338.2 and 6-5-338.3 apply to any cause of action that accrued on or after October 1, 2025.").

maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Hollis,* 950 So. 2d at 307.

It is undisputed that Dorman was acting in his discretionary function as a police officer. *See Ex Parte City of Homewood,* 231 So. 3d 1082, 1087 (Ala. 2017) ("[A]rresting or attempting to arrest an individual is a discretionary function."). Thus, the remaining question for state-agent immunity on each of Sizemore's claims is whether she has demonstrated that either of the two exceptions to state-agent immunity applies.

### a. Assault and Battery

Under Alabama law, excessive force during an arrest constitutes assault and battery. *See Franklin v. City of Huntsville*, 670 So. 2d 848, 852 (Ala. 1995). The Alabama Supreme Court has noted that, "[i]n making [an] arrest, a police officer may use reasonable force and may be held liable only if more force is used than is necessary to effectuate the arrest." *Id.* Sizemore's

31

battery claim therefore turns on whether Dorman used excessive force. *See Walker v. City of Huntsville*, 62 So. 3d 474, 494 (Ala. 2010) (holding that a ruling on whether an officer used excessive force collaterally estopped plaintiff's assault and battery claim because the excessive force issue was "identical to the issue raised by [the plaintiff]'s assault and battery claim."). As discussed previously, there is a genuine dispute of material fact over whether Dorman used force on Sizemore after she stopped resisting, which precludes summary judgment.

Dorman is not entitled to state-agent immunity for the same reason. When an officer uses "excessive force in violation of the Fourth Amendment ... he cannot benefit from Alabama's immunity doctrines because 'the Constitution ... requires otherwise.'" *Robinson v. Rankin*, 815 F. App'x 330, 344 (11th Cir. 2020) (per curiam) (citing *Cranman*, 792 So. 2d at 405); *see also Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019)

32

("[S]tate-agent immunity do[es] not immunize [law enforcement officers] from liability under state law if they violated ... constitutional rights."). Sizemore's battery claim will proceed to trial as to the second and third tases.

### b. Invasion of Privacy

Under Alabama law, invasion of privacy consists of four limited and distinct wrongs: "(1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use." *Johnston v. Fuller*, 706 So. 2d 700, 701 (Ala. 1997). Because Sizemore grounds her claim in the first option--intrusion upon physical solitude--the first step is for her to demonstrate that "'the thing into which there is intrusion or prying is entitled to be private,' after

33

which 'the court will consider two primary factors in determining whether an intrusion is actionable: (1) the means used, and (2) the defendant's purpose for obtaining the information.'" *Shaw v. City of Selma*, 241 F. Supp. 3d 1253, 1282 (S.D. Ala. 2017) (Steele, J.), *aff'd*, 884 F.3d 1093 (11th Cir. 2018) (quoting *Martin v. Patterson*, 975 So. 2d 984, 994 (Ala. Civ. App. 2007)).

Sizemore presented no argument about this claim in her brief.  The court is not required to "distill every potential argument that could be made based upon the materials before it on summary judgment."  *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc).  It has discretion to treat claims that are not defended at summary judgment as abandoned.  *See id.* The court chooses to do so here.[13]  Summary judgment will

---

13. The court nevertheless did some research on this issue.  There does not appear to be any caselaw from Alabama or the Eleventh Circuit demonstrating that a finding of excessive force satisfies the elements for invasion of privacy.  Given the lack of clarity in the

therefore be granted in favor of Dorman on Sizemore's invasion-of-privacy claim.

### c. Outrage

To establish a claim for outrage under Alabama law, a plaintiff must show that the defendant's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Harrelson v. R.J.,* 882 So. 2d 317, 322 (Ala. 2003) (quoting *Thomas v. BSE Indus. Contractors, Inc.,* 624 So. 2d 1041, 1043 (Ala. 1993)).

"The tort of outrage is an extremely limited cause of action." *Little v. Robinson*, 72 So. 3d 1168, 1172 (Ala. 2011) (quoting *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000)). The Alabama Supreme Court has recognized a claim of outrage in only four instances: "(1) wrongful conduct in the family-burial context, (2) barbaric

caselaw and lack of argument from Sizemore, the court declines to broach this issue.

35

methods employed to coerce an insurance settlement, (3) egregious sexual harassment," and, most recently, (4) abuse of a patient-counselor relationship to solicit sexual acts from a minor in exchange for illegal drugs. *21st Mortg. Corp. v. Robinson*, -- So. 3d --, No. SC-2023-0304, 2024 WL 5179041, at *8 (Ala. Dec. 20, 2024) (internal citations omitted). The claim "is viable only when the conduct is 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Little*, 72 So. 3d at 1173 (quoting *Horne v. TGM Assocs., L.P.*, 56 So. 3d 615, 631 (Ala. 2010)).

Because the tort of outrage is so limited, it is unlikely the Alabama courts would recognize a claim under the circumstances present here. Dorman's actions simply do not rise to the level of egregiousness that is considered "utterly intolerable in a civilized society." *Id.* Moreover, because Sizemore also failed to defend

36

Dorman's request for summary judgment on this claim, the court also deems it abandoned. Summary judgment will therefore be granted in favor of Dorman on Sizemore's outrage claim.

### d. Negligence

"The elements of a negligence claim are a duty, a breach of that duty, causation, and damage." *Am. Bankers Ins. Co. of Fla. v. Pickett*, 424 So. 3d 920, 930 (Ala. 2025) (quoting *Prill v. Marrone*, 23 So. 3d 1, 6 (Ala. 2009) (per curiam)). Dorman concedes that "a negligence claim can be founded on an officer's duty to refrain from using excessive force." Dorman Br. in Support of Mot. for Summ. J. (Doc. 74) at 29 (citing *Robinson v. City of Bessemer*, 2:21-cv-00439-JHE, 2024 WL 315005 (N.D. Ala. Jan. 26, 2024) (England, M.J.)). Consequently, Sizemore's negligence claim turns on whether Dorman breached his duty by failing to refrain from using excessive force. This court has already decided that this question presents a material issue of fact. Dorman

37

is likewise not entitled to state-agent immunity, for the same reasons discussed with regard to the assault-and-battery claim.  Sizemore's negligence claim will proceed to trial as to the second and third tases.[14]

### B. Claim Against the City of Montgomery

Sizemore also asserts a federal claim against the City of Montgomery based on § 1983.  She argues that the city had a custom of permitting excessive force, that it failed to train its officers adequately on use of force, and that it failed to supervise its officers adequately on the use force.

Under § 1983, municipalities cannot be held vicariously liable for the actions of their officers. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691

---

14. Sizemore's response also appears to raise an argument based on wantonness. *See* Pl.'s Resp. (Doc. 100) at 43.  However, Sizemore did not plead wantonness in her first amended complaint.  It is well settled that a plaintiff cannot establish a new claim for relief through summary-judgment briefing.  *See Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam).  The court therefore disregards this argument.

(1978). Rather, as the Supreme Court established in *Monell*, for a municipality to be liable, a subordinate officer must have acted "pursuant to official municipal policy of some nature" and the policy must have "caused [the] constitutional tort." *Monell,* 436 U.S. at 691. A municipal 'policy' need not be formal. An unofficial custom that acts with the force of law, or a failure to train, supervise, or otherwise correct constitutional violations may be considered a policy. *See Baxter v. Roberts*, 54 F.4th 1241, 1270 (11th Cir. 2022); *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). The Eleventh Circuit has distilled liability under *Monell* into three requirements: "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Underwood v. City of Bessemer*, 11 F.4th 1317, 1333 (11th Cir. 2021) (quoting *McDowell v. Brown,* 392 F.3d 1283,

1289 (11th Cir. 2004)).   Since this court has already
concluded that Sizemore's Fourth Amendment right was
violated, only the second and third elements are at issue
here.   Sizemore's claims fail on the second element.

Sizemore has not demonstrated that the city had a
custom or policy that amounted to deliberate
indifference.   Although she asserts three bases for her
claim--custom, failure to train, and failure to
supervise--each theory boils down to the same argument:
the city, despite being "on notice" of previous
excessive-force violations by its police officers, failed
to "take steps to remediate" the problem.   Pl.'s Resp.
(Doc. 99 and Doc. 100) at 1.   Sizemore's claim fails
because she has not demonstrated that there was a pattern
of excessive-force violations sufficient to put the city
on notice of a need to correct any constitutional
violations.

The Eleventh Circuit "has held that without notice
of a need" to correct a violation, "a municipality is not

40

liable as a matter of law." *Gold*, 151 F.3d at 1351. Notice is typically established through prior incidents. *See id.* (collecting cases). While there is no magic number for establishing sufficient notice, "it is generally necessary to show a persistent and wide-spread practice." *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986).

Sizemore submits evidence of five incidents of prior excessive force. Specifically, she relies on (1) a 2020 incident where an officer used a chokehold until a person fell unconscious; (2-3) two other alleged chokehold incidents; (4) *Pettaway v. Barber*, a civil-liability case where the estate of Joseph Lee Pettaway sued the police department for unleashing a canine on Pettaway, who was unarmed and died from his wounds; and (5) the 2016 shooting of Gregory Gunn by a city officer and the officer's subsequent conviction for manslaughter.[15] *See*

---

15. Sizemore chiefly relies on the five incidents described above. However, because she has occasionally

Pl.'s Resp (Doc. 99) at 32.   The details of these incidents are as follows.

(1) *The 2020 Chokehold Incident*: Finley testified in his deposition that he was aware of an officer who, in 2020, had used a chokehold on a person until that person fell unconscious.  Finley said he recommended suspension

_____

pointed to other evidence, the court will briefly address that here.

First, in her amended complaint, Sizemore mentioned two additional excessive-force lawsuits against city officers that allegedly help establish a pattern of excessive-force violations.  *See* Am. Compl. (Doc. 26) ¶ 32.  However, Sizemore does not appear to rely on those incidents in her summary-judgment briefing, possibly because both claims were resolved in favor of the officers.

Second, Sizemore argues in some of her response papers that a 2020 investigation into 12 officers for city "policy violations, ethics violations, fraud, and falsifying records" helps support her claim that there were "institutional breakdowns" in the department. Pl.'s Resp. (Doc. 100) at 26.  But Sizemore's claim is for excessive force, not general department incompetency. Broad allegations of unrelated misconduct do not satisfy causation under *Monell*.  *See City of Canton v. Harris*, 489 U.S. 378, 391 (1989) (noting that the causation element of municipal liability requires that "the identified deficiency ... must be closely related to the ultimate injury").

for the officer, but the mayor went beyond his recommendation and terminated the officer. Finley also said that around that time, the city police department was updating its chokehold policy in response to the killing of George Floyd.

(2 and 3) *The Other Chokehold Incidents*: Sizemore relies on the deposition testimony of Finley to allege that two additional chokehold incidents took place in early 2020. Finley testified that the officer who was terminated for his use of a chokehold complained that two other officers also used chokeholds around the same time but were not fired or otherwise disciplined. Sizemore submitted no other evidence of these alleged incidents.

(4) *Pettaway v. Barber*: In 2018, city police responded to a suspected unarmed burglary. Officer Barber released his canine into the house without first issuing proper warnings. In 2023, which was two years after Dorman tased Sizemore, U.S. District Court Judge Emily Marks held that the use of force was excessive and

43

denied qualified immunity.    *See Pettaway v. Barber*, No. 2:19-cv-008-ECM, 2023 WL 1422457, *7–10 (M.D. Ala. Jan. 31, 2023) (Marks, C.J.).

(5) *Shooting of Gregory Gunn*: In 2016, a city police officer shot an unarmed Black man.  The police department labelled the incident a "clean shot."  In 2019, a jury found the officer guilty of manslaughter.  The civil case settled in 2020.

These incidents fall short of demonstrating a wide-spread practice of constitutional violations.  Even putting aside individual issues with the first four incidents,[16] Sizemore does not have enough evidence.  She has alleged five incidents spread across a span of six years.  This stands in sharp contrast to the evidence

---

16. Those issues are: (1) the city was responsive to one chokehold incident; (2-3) Sizemore may encounter a hearsay issue when presenting evidence of the other two chokehold incidents; and (4) Judge Marks's excessive-force finding was issued two years after Dorman's actions in this case.  The court notes but does not reach these issues.

presented in *Depew v. City of St. Marys*, upon which Sizemore relies.   In *Depew*, the plaintiff presented testimony from several community members who had been personally harassed by police; documentary evidence like "personnel evaluation reports [and] employee warning reports" showing repeated uses of excessive force; testimony from officers about their lack of training on use of force; and the police chief's own admission that despite having "disciplinary problems with his officers" he did "little to rectify the problem." *Depew*, 787 F.2d at 1488.   Sizemore's evidence falls short of the threshold established in *Depew* and elsewhere. *See id.*; *see also Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001) (describing in detail the testimony of at least seven women and referencing the testimony of several more when finding that the plaintiff had sufficiently alleged a custom of permitting workplace sexual harassment).

Summary judgment will be entered in favor of the City of Montgomery on the claim against it.[17]

### C. Claim Against Finley

Finally, Sizemore asserts a federal claim against Finley, the former City Police Chief, based on § 1983. She makes the same claim against Finley as she does against the city: that Finley had a custom of permitting

---

17. In her briefing, Sizemore also asserts that the city should be liable because it failed to properly screen Dorman's application to join the police department. Even putting aside that Sizemore did not allege a failure to screen in her amended complaint, the court finds that the argument fails for lack of causation. Sizemore generally asserts that, because Dorman had smoked marijuana and hung out with some gang members as a teenager, he never should have been hired, which makes the city responsible for his conduct. The Supreme Court has squarely rejected this kind of simple but-for causation. "The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong." *Bd. of Cnty. Comm'ns of Bryan Cnty. v. Brown*, 520 U.S. 397, 412 (1997). Sizemore does not explain how Dorman's childhood affiliation with a gang or past illicit drug use caused him to use excessive force against her, or how the city should have predicted it would.

46

excessive force and that he failed to train and supervise his officers.  Finley asserts qualified immunity.

The standard for holding a supervisor liable under § 1983 can differ from that for a municipality. "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990).  Since Finley did not personally participate in the tasing, Sizemore must establish a causal connection between Finley's behavior and Dorman's actions.

A causal connection between a supervisor and employee can be established in three ways: (1) when the supervisor "directed the subordinates to act unlawfully"; (2) when a supervisor's "custom or policy results in deliberate indifference to constitutional rights"; or (3) when "a history of widespread abuse puts the responsible

47

supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

Sizemore relies on the second two theories. Because the custom or policy theory mirrors *Monell*, *see Greason v. Kemp*, 891 F.2d 829, 837 (11th Cir. 1990), that theory is unavailing for the reasons discussed above. All that remains is the "history of widespread abuse" theory. To allege a history of widespread abuse, deprivations must be "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Brown*, 906 F.2d at 671. The incidents Sizemore alleged are more akin to isolated occurrences than rampant violations. Because Sizemore has not provided sufficient evidence of widespread abuse that would have put Finley on notice of a need to correct any issue, summary judgment will be granted in favor of Finley on the claim against him.

48

***

Accordingly, it is ORDERED that:

(1)   Defendant Ernest Finley's motion for summary judgment (Doc. 68) is granted, and judgment is entered in favor of defendant Finley and against plaintiff Emily Sizemore, with plaintiff Sizemore taking nothing by her complaint as to said defendant.   Said defendant is terminated as a party.

(2)   Defendant City of Montgomery's motion for summary judgment (Doc. 73) is granted, and judgment is entered in favor of defendant City of Montgomery and against plaintiff Sizemore, with plaintiff Sizemore taking nothing by her complaint as to said defendant. Said defendant is terminated as a party.

(3)   Defendant Richard Dorman's motion for summary judgment (Doc. 73) is granted in part, and judgment is entered in favor of defendant Dorman and against plaintiff Sizemore on plaintiff Sizemore's outrage and invasion-of-privacy claims, with plaintiff Sizemore

49

taking nothing by her complaint on these claims against said defendant.

(4)    Defendant Dorman's motion for summary judgment (Doc. 73) is denied in part, that is, as to plaintiff Sizemore's excessive-force, assault-and-battery, and negligence claims against said defendant as to the second and third alleged tases.  These claims will go to trial to this extent as to said defendant.

This case is not closed.

DONE, this the 27th day of March, 2026.

    /s/ Myron H. Thompson    
UNITED STATES DISTRICT JUDGE